COMMONWEALTH *vs.* ARTHUR A. GAUTHIER.

Essex. November 19, 1985. — February 11, 1986.

Present: KASS, WARNER, & FINE, JJ.

*Identification. Evidence,* Cross-examination, Bias. *Error,* Harmless. *Practice, Criminal,* Instructions to jury. *Witness,* Bias. *Assault with Intent to Rob.*

At the trial of charges arising out of assaults on two separate victims, the judge did not err in refusing to suppress showup identifications of the defendant by his victims, who identified him shortly after the assaults had been committed when the defendant had been brought to them for identification, where, although one victim was asked in a one-on-one audition to identify the defendant's voice by hearing him repeat the words she heard spoken at the scene of the crime, she had already unequivocally identified him by sight and where, despite there being time to arrange a lineup for the other victim to view the defendant, the police, in conducting their investigation, were entitled to establish quickly whether the same man was involved in both attacks. [587-588]

At the trial of a defendant charged with unarmed assault with intent to rob and other crimes, it was not reversible error for the judge to limit defense counsel's cross-examination, seeking to establish bias of a government witness, by threatening to instruct the jury that they were not to consider the significance of the reasons for dismissal of a forgery charge which had been pending against the witness, where the witness had not been implicated in the crimes being tried but had played a completely spontaneous role, unlikely to have been motivated by bias, in coming upon the scene and frightening off the assailant. [588-590]

The judge at a criminal trial did not err in refusing to instruct the jury that the crime of unarmed assault with intent to rob requires proof of actual force and violence, not just the threat of it. [590-591]

INDICTMENTS found and returned in the Superior Court Department on May 26, 1982.

The cases were tried before *Hiller B. Zobel,* J.

*Eric Brandt,* Committee for Public Counsel Services, for the defendant.

*Edward F. Connelly,* Assistant District Attorney, for the Commonwealth.

KASS, J. As found by a jury, Arthur A. Gauthier, the defendant, committed an unarmed assault with intent to rob[1] and an assault and battery[2] upon Penny Broach on High Street in Salem at 10:00 P.M. on April 21, 1982. One-half hour later, on Ward Street, he committed an armed assault with intent to rob[3] and assault and battery by means of a dangerous weapon[4] upon Patricia Carney. On his appeal, Gauthier urges that the trial judge erred in: (1) refusing to suppress identifications made by the victims; (2) limiting, by threat of nullifying instructions, cross-examination to establish bias of a government witness; and (3) refusing to instruct the jury that the crime of unarmed assault with intent to rob requires proof of actual force and violence.

In one night, Gauthier inflicted more than his share of trauma. As a robber, fortunately, he was hapless. Broach, the first victim, noticed Gauthier because he appeared to be watching her intently as she entered Steve's Quality Market in downtown Salem. She noticed his stare, his eyes, his glasses, his long greasy hair, his acne. When Broach emerged from the market, the man she had noticed followed her, reached for Broach's arm, and demanded her money. Broach kicked him in the groin and hurried to the store for safety. She made a report to the police at about 10:15 P.M.

Patricia Carney spotted Gauthier at 10:30 P.M. as she was walking home along Lafayette Street. Her attention was drawn to Gauthier because she thought it odd that he was wearing sunglasses at night. As Carney turned down Ward Street, she heard footsteps behind her. The source of the footfalls grabbed

---

[1] G. L. c. 265, § 20.

[2] G. L. c. 265, § 13A.

[3] G. L. c. 265, § 18.

[4] G. L. c. 265, § 15A.

Carney by the hair and spun her around, at which she screamed. Her screams provoked threats from the assailant: "If you don't shut up, I'm going to put a bullet right through your head." When that failed to induce silence the assailant struck Carney with a metal object she took to be a gun. A neighbor, Daniel Benyue, heard the commotion, looked out his window, and shouted: "Stop or I'll blow your . . . head off." Gauthier found it expedient to unhand Carney and leave the scene. Carney immediately ran to her apartment on Ward Street and called the police.

1. *Refusal to suppress identifications.* On the basis of the complaints and descriptions telephoned in by Broach and shortly thereafter by Carney, the police picked up the defendant within fifteen minutes of the second incident. Two police officers at once drove Gauthier in a police cruiser to Carney's residence for a "showup" identification. Cases acknowledging the utility and permissibility of arranging showups, promptly after the crime, are collected in *Commonwealth* v. *Coy,* 10 Mass. App. Ct. 367, 371-372 (1980), and, indeed, the defendant concedes as a general proposition the lawfulness of showups. Broach also identified Gauthier as her assailant that evening in a showup. Each witness, the judge found in denying Gauthier's suppression motion, unhesitatingly identified Gauthier.

The Carney identification went bad, the defendant argues, because he was asked to repeat out loud to Carney for voice identification purposes the threat he had uttered, i.e., "If you don't shut up, I'm going to kill you." Carney said Gauthier sounded like her assailant and, indeed, smelled like her assailant. Voice identification is suspect, although not unlawful per se, under *Commonwealth* v. *Marini,* 375 Mass. 510, 515-519 (1978). See also *Commonwealth* v. *Torres,* 367 Mass. 737, 740-741 (1975). In *Marini* the court reviewed the authorities and set down precautions to be observed if a voice identification is used: (1) one-on-one auditions are to be avoided; (2) preferably the witness ought not to be viewing the speaker; (3) the words chosen for repetition should not be those heard by the

witness at the scene of the crime. *Id.* at 517.[5] None of those precautions was observed.

*Marini,* however, dealt with voice identification at trial. The court noted that "there will be occasions when standard precautions may well be overlooked, for example, when a suspect is apprehended very soon after the criminal event and is brought promptly to the victim for direct voice identification." *Id.* at 517. See *Wise* v. *United States,* 383 F.2d 206, 208-209 (D.C. Cir. 1967), cert. denied, 390 U.S. 964 (1968). That is what occurred in the instant case. In any event, whatever disquiet we might have about elements of suggestiveness in the voice identification of Gauthier is laid to rest by the peripheral significance of the audition to the case. Carney had already unequivocally identified Gauthier by sight before she heard him speak.[6] As noted, she also remarked his smell. Contrast *Commonwealth* v. *White,* 11 Mass. App. Ct. 953, 954 (1981), in which the witness could not identify the suspect until she heard him speak. The judge was right in declining to suppress Carney's pretrial identification of the defendant.

Gauthier argues that the second showup, to Broach (who was the first victim), was unnecessary and hence unduly suggestive, because Gauthier by then had already been identified in connection with the attack on Carney and was in custody. There was time to arrange a lineup. We think the police, in conducting their investigation, were entitled to establish quickly whether the same man was involved in the two attacks. See *Commonwealth* v. *Fay,* 14 Mass. App. Ct. 371, 373 (1982); *Commonwealth* v. *Perretti,* 20 Mass. App. Ct. 36, 41-42 (1985).

2. *Limitation of cross-examination.* Daniel Benyue, Carney's neighbor, testified about seeing the attack on Carney

---

[5] Contrast *Commonwealth* v. *O'Loughlin,* 17 Mass. App. Ct. 972 (1984), where police officers at a showup engaged the suspect in normal conversation rather than requiring him to speak the words uttered by the assailant during the rape.

[6] The evidence is conflicting on whether Carney or a police officer asked Gauthier to speak. In ruling on the suppression motion, the trial judge said that he thought the request had been made by Carney.

from his window and scaring off the attacker. He identified Gauthier as the assailant.[7] Prior to cross-examining Benyue, defense counsel informed the court at a bench conference that he proposed to ask Benyue if he had been arrested for forgery, if those charges were pending when he made a statement about the attack on Carney implicating Gauthier, if he had defaulted in appearances on those charges, and if those charges were dismissed shortly after he gave a statement to the police in the instant case.

The trial judge ruled that he would permit defense counsel to inquire of Benyue if he had stood accused of forgery. Were counsel to ask if the charge had been dismissed, the judge said he would explain to the jury that cases are dismissed for a wide variety of reasons and that the jurors were not to speculate why that charge had been dismissed. The judge also remarked, "I regard . . . putting in this accusation — as . . . very marginal, dramatically marginal, and I will say for the record it might well explode in the defendant's [face,] [a]nd if it does, the defense has only itself to blame."

When he took Benyue under cross-examination, defense counsel put no question about a forgery charge. He may have heeded the judge's admonition that the proposed line of questioning might backfire. We are prepared, however, to consider the defendant's point on the basis of his contention that the judge's comments at the voir dire were more than a damper; that they were a chiller. Cf. *Commonwealth* v. *Graziano,* 368 Mass. 325, 330 (1975). Compare *Commonwealth* v. *Morris,* 20 Mass. App. Ct. 114, 119 (1985) (limitation on counsel's cross-examination self-imposed). No one contests (nor could he in the face of the authorities) that a defendant may introduce evidence of pending charges to suggest bias of a prosecution witness. *Commonwealth* v. *Graziano, supra* at 330. *Common-*

---

[7] Benyue had hoped to apprehend the defendant but that went awry. "He started walking slowly," Benyue testified, "so I figured I had a chance to put on my pants and run down the stairs to try to catch him. . . . But in the meantime I got hung up with the phone. I had the receiver in one hand, the pants in the other and I fell down the stairs."

*wealth* v. *Dougan,* 377 Mass. 303, 310 (1979). *Commonwealth* v. *Connor,* 392 Mass. 838, 841 (1984). *Commonwealth* v. *Lewis,* 12 Mass. App. Ct. 562, 572 (1981). *Commonwealth* v. *Dean,* 17 Mass. App. Ct. 943 (1983).

There is force to the argument that prompt dismissal of the forgery charge was admissible on the basis that favorable treatment of a prosecution witness is relevant to the question of bias. *Commonwealth* v. *Rodwell,* 394 Mass. 694, 699-700 (1985). Cf. *Commonwealth* v. *Connor,* 392 Mass. at 848-850. For the judge to have instructed the jury, as he said he would do, that they were not to consider the significance of the reasons for dismissal would have invaded the jury's province and would have been error. Precisely what the jurors were free to do was to infer bias from the charge, the dismissal, and other circumstances.

Assuming that the defense was entitled to take at face value the judge's statement of intent about how he would instruct the jury, the limitation of cross-examination on bias does not amount to reversible error in this case. Benyue was not implicated in the crime, unlike the witness in *Commonwealth* v. *Lewis,* 12 Mass. App. Ct. at 569. He had come upon the scene and was actively involved in the frightening off and, ultimately, the hunt of the assailant. The idea that his spontaneous role in the episode was motivated by bias was so unlikely that although the judge, by threat of nullifying instructions, may be said erroneously to have excluded a permissible question, the error was harmless beyond a reasonable doubt. That conclusion is buttressed by (a) the cumulative character of Benyue's testimony; (b) the powerfully probative identifications by the victims; and (c) his testimony on direct examination that he had been in some persistent difficulty on minor charges with the Salem police. Defense counsel, thus, already had a platform from which to make a biased witness argument about Benyue's testimony.

3. *Jury instructions.* Over objection, the trial judge instructed the jury that, to convict of assault with intent to rob, they must find that the defendant had "threatened bodily harm to [the victim] with the intention of taking from her person, against

her will, money." Relying on *Commonwealth* v. *Crowley,* 167 Mass. 434, 442 (1897), the defendant requested an instruction that actual violence, not just the threat of it, was an essential element of the crime. To the extent that the *Crowley* case points to such a definition of unarmed assault with intent to rob, it is no longer the law. Physical intimidation, constructive force, as it is sometimes called, as well as personal violence will support a charge of robbery. *Commonwealth* v. *Jones,* 362 Mass. 83, 86-88 (1972). Sufficient force to produce a reasonable apprehension of bodily injury without necessarily touching the victim has been held to satisfy the statutory crime, G. L. c. 265, § 20: "Whoever, not being armed with a danger-ous weapon, assaults another with force and violence and with intent to rob or steal . . . ." See *Commonwealth* v. *Ramos,* 6 Mass. App. Ct. 955 (1978); *Commonwealth* v. *Correia,* 17 Mass. App. Ct. 233, 236 n.8 (1983).

*Judgments affirmed.*