Macdonald, D. Lloyd, J.
Before the Court is the defendant’s motion to suppress the photo, showup and voice identifications of the defendant.
The motion is DENIED for the reasons that follow.
Findings of Fact
1. On May 2, 2009 Joseph Francoeur (“Francoeur”) was robbed at knife point while driving a cab in Fall River shortly after 10 p.m.
2. Francoeur was working the evening (3 p.m. to 6 a.m.) shift for the Yellow Cab company. At around 10 p.m. he received a call from dispatch to pick up a fare at Silva’s Package Store (“Silva’s”) on Bedford Street in the city.
3. When he arrived at Silva’s, there was no one waiting in the area, so Francoeur parked the cab in front of the store and waited for the fare. As people were coming and going on the street, he looked at them for signs that they were the fare. The area was well illuminated by the combination of the overhead street lights, the reflection of light from the store and headlights of passing cars.
4. After approximately five minutes, Francoeur concluded that the call was a no-show and so informed the dispatcher. However, as he was pulling the cab into the line of traffic, he saw a person—later identified as the defendant—hailing him from a distance of about 40 feet. Francoeur watched him approach the cab and to get in the back seat. Francoeur had a clear view of his face, notwithstanding the person’s wearing a baseball cap and hoody.
5. Upon the person settling into the back seat, Francoeur—following his usual practice in such situations—put on what he described as the “map light” so as to illuminate the back seat and turned around and looked directly into the person’s face. Francoeur described that he follows this practice so that “in case anything happens, I can have a good look at him.” The passenger was described as a white or Hispanic male, with a “good build,” about 5’10" tall with a “scruffy” look—the latter suggesting a couple of days growth of facial hair.
6. The passenger told Francoeur to take him to the Charlton Hospital where he described that he would be picking up his girlfriend. However, before the cab reached Charlton (about a five-minute drive from Silva’s), the passenger informed Francoeur that, instead, he would get the money from his home and directed Francoeur to reverse direction to return to the vicinity of Silva’s where the passenger allegedly lived. When they got there, Francoeur stopped the cab, and as he put the cab in Park, the passenger leaned forward from the back seat and placed a long (6-7") silver-bladed knife at Francoeur’s throat (without touching him) and demanded his money.
7. Francoeur retrieved approximately $50 he had in his pocket and reached into the back seat (without looking back) and gave it to the passenger. The passenger then ran from the cab into the night.
8. Francoeur had had a good look at the robber’s face and sufficient conversation with him to be able to recognize the robber.
9. Francoeur reported the robbery to his dispatcher, who called the police.
10. Officer Thomas Barboza (“Barboza”) responded and took the report. Barboza described Francoeur as “pretty shaken up.” Francoeur went to the station where a gave a fuller report after settling down.
11. No suspects were identified on May 2nd, but on May 5th Francoeur was contacted by the police and asked to come down to the station to view some photographs of potential suspects.
12. Det. Lawrence Ferreira (“Ferreira”), who had been an officer for 23 years and 13 as a detective, met Francoeur at the station. Ferreira was investigating a recent string of cab robberies and was familiar with Barboza’s report of the May 2nd robbery.
13. In the meantime, the defendant was in custody at the station in connection with an unrelated incident, but he generally matched Francoeur’s description of his assailant. By Ferreira’s inputting the factors of age, race, height, hair and sex that matched the Francoeur suspect, the police computer generated a photo array. Ferreira added the defendant’s photo to comprise a six-photo array. Exhibit 1.
14. From an appearance perspective, the defendant’s picture was indistinguishable from the others in the array.
15. Ferreira instructed Francoeur to view the photos and told him that the person who robbed him may or may not be there.
16. Also in the room at the time was Captain (at the time of the suppression hearing, Chief) Daniel Racine (“Racine”).
17. When Francoeur viewed the photo of the defendant, he said that if he had a hat on, it could be the *358 robber. Ferreira then put a piece of paper over the foreheads of all the persons in the photo array. Francoeur after looking further at the defendant’s picture, said that he was “8 out of 10" sure that the defendant’s picture was a picture of the robber. Francoeur then volunteered that if he could see him in person, he could be sure.
18. It was important to the police that they either confirm their suspicion of the defendant’s responsibility for the robbery or exonerate him of it by finding out then whether in fact Francoeur recognized the defendant as the robber.
19. Racine then told Francoeur that they had someone in custody “who may or may not be the guy.”
20. 10-15 minutes later, Racine brought the defendant, who was in handcuffs or shackles, into an interview room at the station with a two-way mirror. Francoeur was on the other side and could hear Racine speaking to the defendant and the defendant’s spoken responses to Racine.
21. The defendant was secured in shackles or handcuffs in keeping with routine procedure for persons in custody. The reason for the policy was for the safety of officers and others present in the station.
22. When Francoeur saw the defendant through the glass, he said, ‘That’s the guy.”
23. Francoeur also recognized the defendant’s voice as similar to that of the robber’s.
24. Neither Ferreira nor Racine put any pressure on Francoeur to make an identification, either in the context of the photo array or the showup. Francoeur credibly testified that he felt under no pressure. He testified that at the photo array stage and the showup the officers stated to him that the robber may or may not be in the array or be the person being brought in the room.
25. At the hearing, Francoeur identified the defendant in court. In doing so, he was relying on his observations of the robber on May 2nd and not on the basis of the photo and showup identifications.
26. Ferreira and Racine were credible in all material respects. Neither exerted any pressure on Francoeur to make an identification or engaged in any intentional suggestiveness as to the defendant.
27. With Francoeur having made a qualified (8 out of 10 certainty) photo identification and with his further having said to the officers that if he could physically see the person, he was likely to be able to be sure about it, Racine and Ferreira believed that a showup would permit them to either confirm the defendant’s status as a suspect in the Francoeur robbery or exonerate him if, in person, the defendant was not recognized by Francoeur.
Discussion
Eyewitness identifications have been “long recognized” by the SJC as “presentfing] a substantial risk of misidentification . . . and increase[ing] the chance of conviction of an innocent defendant.” Commonwealth v. Silva-Santiago, 453 Mass. 782, 796 (2009) (quotation and citation omitted). However, in order to suppress an identification, the defendant must show by a preponderance of the evidence that, in the light of the totality of the circumstances, the procedures employed in the identification were so unnecessarily or impermissibly suggestive and conducive to irreparable misidentification as to deny the defendant due process of law. See id. at 799 and Commonwealth v. Botelho, 369 Mass. 860, 866 (1976).
One-on-one or showup identifications are disfavored because they are viewed as inherently suggestive. See Commonwealth v. Johnson, 429 Mass. 458, 461 (1995). See also Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Although exigent or special circumstances are not a prerequisite to one-on-one identifications, good reason must exist if such an identification is to pass muster. Commonwealth v. Austin, 421 Mass. 357, 361 (1995). Factors relevant to “good reason” include: the nature of the crime involved and the corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of the crime; the usefulness of prompt confirmation of the accuracy of investigative information, which, if in error, results in the freeing of innocent people and releases the police quickly to follow other leads. Austin, 421 Mass. at 362. The good reason inquiry does not require a showing that the one-on-one identification was necessary, only that the police have good cause for their actions. Commonwealth v. Martin, 447 Mass. 274, 280 (2006).
In addition, prompt confrontation allows a witness to identify a suspect while the incident is still fresh in his mind and before other images crowd in or before a witness’s efforts to verbalize his impressions distort the witness’s authentic recollection. Commonwealth v. Leaster, 395 Mass. 96, 103 (1985). See also Commonwealth v. Hill, 64 Mass.App.Ct. 131, 133-34 (2004) (twenty-four-hour time lapse between the crime and identification allowed the victim to see the suspect while the face of the intruder was still fresh in his mind).
Furthermore, the failure of police to pursue alternative identification procedures, however, does not in itself render a one-on-one identification unduly suggestive. Martin, 447 Mass. at 280. The focus is on whether the police acted permissibly, not whether an alternative would have been better. Id.
Voice identifications may also be impermissibly suggestive. See, e.g., Commonwealth v. Marini, 375 Mass. 510, 516-18 (1978). “In Marini the court reviewed the authorities and set down precautions to be observed if a voice identification is used: (1) one-on-one auditions are to be avoided; (2) preferably the witness ought not to be viewing the speaker; (3) the words chosen for repetition should not be those heard *359 by the witness at the scene of the crime.” Commonwealth v. Gauthier, 21 Mass.App.Ct. 585, 587-88 (1986). However, significance is placed on the fact that a witness rather than the police asks for the voice identification. See Marini, 375 Mass. at 516-17; Commonwealth v. DeMaria, 46 Mass.App.Ct. 114, 116 (1999).
With these principles in mind, Francoeur’s photo, showup and voice identifications of the defendant can stand. The defendant failed to meet his burden to demonstrate undue suggestiveness. While Ferreira and Racine may not have recited verbatim the Silva-Santiago protocol, 453 Mass. at 797-98, they communicated to Francoeur (and Francouer understood) the core substance of the protocol—namely, that the person who robbed him may not have been in the array and may not have been the person on the other side of the two-way mirror and that the process was otherwise free of suggestiveness. With the ready proximity of the defendant, with the availability of Francoeur and with the public safety interest in promptly determining whether the defendant was responsible for the May 2nd robbery, Ferreira and Racine had good reason for the station showup. Further, the voice identification, such as it was, resulted from Francoeur’s initiative, not, the police’s. Accordingly, the issues here “go solely to the weight of the identifications, not to [their] admissibility.” Id. at 799. There is no state or federal constitutional reason to suppress the evidence.
ORDER
The defendant’s motion to suppress the identifications is DENIED.