COMMONWEALTH *vs.* DANA A. MONSEN.

Middlesex. December 5, 1978. — February 6, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Exceptions: failure to save exception; Capital case; Duplicitous punishment; Instructions to jury. *Evidence,* Other offense.

This court declined to decide whether a defendant, who was convicted of murder in the first degree, assault and battery by means of a dangerous weapon, and armed assault within a dwelling and given sentences on the two latter charges to run concurrently with the life sentence imposed on the murder charge, was sentenced on duplicitous indictments in violation of his constitutional protection against double jeopardy where the defendant raised no objection or exception at the time of trial and where any error in the proceedings below was of no practical consequence to the defendant. [250-251]

At the trial of a defendant charged with murder in the first degree, the judge did not err in allowing a witness to testify that he had seen the defendant with a knife shortly before the crime was committed. [251-252]

An accomplice who possesses the necessary malice aforethought to justify a conviction of murder in the second degree may be convicted of murder in the first degree if the principal accomplishes the crime in an extremely atrocious or cruel manner. [253-355]

INDICTMENTS found and returned in the Superior Court on June 14, 1977.

The cases were tried before *Taveira,* J.

*John C. Ottenberg* for the defendant.

*Susan C. Mormino,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant was tried before a Superior Court judge and jury on indictments charging murder in the first degree, assault and battery by means

of a dangerous weapon, and armed assault within a dwelling. The jury returned guilty verdicts on all three indictments.[1] The trial judge then imposed the mandatory sentence of life imprisonment without parole for murder in the first degree, along with sentences of fifteen to twenty years, concurrent, for armed assault within a dwelling, and eight to ten years, concurrent, for assault and battery by means of a dangerous weapon.

The defendant appeals, arguing: (1) that he was subjected to multiple punishments for the same offense in violation of the double jeopardy clause of the Fifth Amendment to the Federal Constitution; (2) that the judge erred in admitting in evidence testimony concerning an unrelated criminal incident in which the defendant was involved; and (3) that the judge's instructions to the jury concerning joint venture and murder committed by extreme atrocity or cruelty were erroneous. None of these arguments is based on an objection or exception taken at the time of the trial.[2] The defendant, however, has asked this court to exercise its broad powers of review under G. L. c. 278, § 33E, and under *Commonwealth* v. *Freeman*, 352 Mass. 556 (1967).

In certain limited instances, this court will grant a new trial notwithstanding noncompliance with the appropriate procedural rules. The test is whether, absent our intervention, there exists a substantial risk that a miscarriage of justice will occur. G. L. c. 278, § 33E. *Commonwealth* v. *Franks*, 365 Mass. 74, 76 (1974). *Commonwealth* v. *Freeman*, *supra* at 563-564. Consistent with our duty under § 33E, we have considered the defendant's murder conviction on the law and the evidence. However, we are unable to conclude that the verdict was against either.

[1] The defendant was tried jointly with John J. Canty, an alleged confederate accused of the same three offenses. Canty was found not guilty of murder, but guilty of the other two crimes.

[2] We note that the defendant's counsel on appeal was not present at the original trial.

Nor do we think that the interests of justice require us to vacate any of the verdicts, grant a new trial, or enter lesser degrees of guilt than those found by the jury. Accordingly, we affirm the defendant's convictions as to all three indictments.

We summarize the evidence as follows. On the evening of May 3, 1977, Dennis McHugh (McHugh), Robert McHugh, Jeffrey Keene, John Canty, and the defendant drove to 21 Commonwealth Avenue in Concord, Massachusetts. The second floor apartment at that address was occupied by James Wallace, Martin Yauga, and John Johnson. McHugh wanted to beat up Wallace and asked the others to come along in the event that he needed protection. McHugh believed that Wallace had gotten his sister pregnant.

On arriving at the apartment, Canty knocked on the door. Johnson opened a window and asked what the men wanted. Canty inquired as to the whereabouts of Wallace and Johnson replied that he did not know. McHugh testified that while this conversation was taking place, Monsen, who was standing on the sidewalk, pulled out his Explorer knife and flicked it open.

A woman then came down the stairs, opened the door leading to the street, and left. Canty went up the stairs, followed by McHugh, Monsen and Keene. McHugh and Monsen went into Johnson's bedroom and asked where Wallace was. Johnson stated that he did not know, that Wallace did not live there, that he did not want to get involved, and told McHugh and Monsen to get out of the house.

When McHugh returned to the kitchen, he noticed that the window leading to the roof was open. He, Monsen, and Canty went out the window and crossed the roof into the next apartment. When they returned, they heard police walkie-talkies and overheard Johnson talking to the police. He was asked whether anything was wrong and answered no. He then shouted upstairs, "Hey, you guys want to leave now?" This enraged both Monsen and

McHugh. However, the group left without further incident, after being questioned briefly by the police as to why they were there. As they drove away, Monsen announced that he was going to give Johnson a beating.

On the evening of May 5, 1977, McHugh, Rick Taranto, Kenneth Dame, Raymond Doucette, Canty and Monsen were together at a bar known as the BCL. There was evidence that many of these individuals, including the defendant, consumed considerable amounts of alcohol and that some of the individuals smoked marihuana as well. At approximately 2 A.M. on May 6, 1977, McHugh, Taranto, Dame, Canty, Doucette and Monsen left the BCL in Dame's Cadillac automobile. McHugh suggested that they stop again at Wallace's apartment and give him a beating. McHugh stated that no one else should touch Wallace unless it became necessary to protect McHugh, whereupon Monsen said, "Well, I'll give Johnson a beating while I'm there." On arriving, the group (with the exception of Dame who remained in the car) broke in through the front door of the building, ran up the stairs and kicked in the door of the apartment. Johnson was the only one there.[3]

McHugh and Taranto were the only witnesses who testified as to what occurred in the apartment that night. McHugh stated that he went into Johnson's bedroom, where Johnson presumably was asleep, and demanded to know where Wallace was. Johnson sat up and asked, "Who is that? What's going on here?" McHugh then went to look for Wallace in the other bedroom, and Monsen entered Johnson's bedroom as McHugh was leaving. McHugh could not find Wallace and began to vandalize the apartment instead. As he passed Johnson's bedroom, he saw Monsen stabbing Johnson in the chest and asked what Monsen thought he was doing. Monsen replied, "Dennis, I killed the m———f———. I killed the f———

---

[3] Wallace had moved out after the previous incident, and Yauga had again exited through the kitchen window.

puke" (expletives deleted). McHugh then turned to Taranto, who had just entered the room, and suggested that they leave. Once outside, McHugh realized that Monsen had not yet come out of the building, so he returned to the front door. Monsen appeared, wiping his hands off on the wall as he came down the stairs.[4]

McHugh and Monsen got into the front seat of Dame's car; McHugh sat in the middle, and Monsen sat by the window.[5] As the car drove away, Monsen kept repeating, "I killed the puke," and said that he had stabbed Johnson nine times. Monsen was holding an Explorer knife, which McHugh had first seen in Monsen's possession several weeks earlier. The blade of the knife was open and covered with blood. At some point while they were still in the car, Monsen turned around, pointed his knife at those in the back seat, and warned that if anyone said anything, he would be next.

As Dame drove toward McHugh's house in Stow, a police cruiser followed. McHugh told everyone to go to the house while he got "rid of the cops." After succeeding in this endeavor, he and Monsen went to wash Monsen's knife off in a nearby stream. At McHugh's suggestion, Monsen buried his jacket in the woods behind McHugh's house.[6] When the two returned to the driveway, Dame, Doucette, and Monsen got into Dame's car and left.

Taranto testified that he did not see Monsen in Johnson's bedroom that night. However, he did say that Mons-

---

[4] A police chemist testified to the presence of human blood smears on the wall of the stairway leading to the victim's apartment.

[5] Examination of Dame's Cadillac automobile revealed blood smears on the right door window, panel, armrest and door handle, on the middle panel of the front seat, and on the right rear side of the front seat back.

[6] The police recovered this jacket and had it examined for traces of blood. The chemist who conducted the examination testified at trial to the presence of heavy bloodstains on the right sleeve, as well as to bloodstains on the left sleeve and front of the jacket. The blood was determined to be of human origin.

en was the last one to enter the car and that immediately after entering the car, Monsen said, "I stabbed that kid nine times." Taranto also corroborated McHugh's testimony concerning Monsen's threat to anyone who decided to talk and his brandishing of the Explorer knife while making the threat.

Dame testified that as they drove away from McHugh's house, a police cruiser followed. Dame and Doucette asked Monsen to throw his knife out the window, which he did.[7] As the car entered Maynard, a police cruiser stopped it, and Monsen ordered the others not to say anything. All of them were arrested and taken to the police station where they were booked for murder.

An associate medical examiner performed an autopsy on Johnson. He testified that Johnson suffered nine stab wounds, which could have been inflicted with the defendant's Explorer knife.

The remaining evidence pertinent to this appeal will be included in our discussion of the questions that we are asked to decide.

1. *Multiple punishment.* The defendant contends that his separate convictions and sentences on all three indictments were duplicitous and in violation of his constitutional protection against double jeopardy. More specifically, the issue raised is that there exists an identity among the three charges which precludes punishment on more than one charge. Although there might be some merit in the defendant's contention, at least with respect to the murder and assault and battery with a dangerous weapon indictments, see *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354-355 (1977); *Kuklis* v. *Commonwealth*, 361 Mass. 302, 307 n.3 (1972), we do not think this a proper case in which to decide the issue. As the defendant registered no objection or exception at the time of trial, our

---

[7] The knife was also recovered by the police. Traces of blood were visible on the blade of the knife. When tested, the blood proved to be of human origin.

powers of review are limited to preventing a miscarriage of justice. See G. L. c. 278, § 33E; *Commonwealth* v. *Freeman, supra.* The sentences that we are asked to strike are to run concurrently with a sentence to life imprisonment without parole. In such circumstances, we will not intervene on the defendant's behalf. Any error in the proceedings below is of no practical consequence to the defendant, and no injustice inheres in our letting the verdicts and sentences stand.

2. *Evidentiary question.* Taranto testified at trial that, while he was at the BCL, he saw the defendant "having a beef with a guy named Bo." Defense counsel requested that this testimony be struck. The judge granted the request and asked all counsel to approach the bench. Discussion at the bench centered on whether Taranto could testify that he saw Monsen holding a knife to Bo's throat. Defense counsel agreed that the Commonwealth could introduce evidence to the effect that "Monsen displayed a knife, Canty saw the knife . . . and Canty told him to put it away." Other comments made by defense counsel strongly suggest that his concern was that the jury not hear the defendant described as having put a knife to another person's throat. Taranto ultimately testified, without objection, that he and Canty were looking through a window at the BCL when he saw the defendant and Bo outside. The defendant was holding a knife which had gold tips at either end, and which was similar to the knife introduced earlier at trial and identified as belonging to the defendant. Taranto further testified, over the defendant's general objection, that Canty went outside "in a hurry."

The defendant now contends that the judge erred in admitting Taranto's testimony in evidence, because it involved an unrelated criminal assault by the defendant on another individual on the night of the murder. The defendant also contends that the judge should have given the jury curative instructions as to that portion of Taranto's testimony which was struck and limiting instructions as to that portion which was allowed. We disagree.

We note at the outset that by failing to object and take exception to the bulk of Taranto's testimony, the defendant has waived his right to raise the admissibility of that testimony on appeal. *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977). *Commonwealth* v. *Underwood*, 358 Mass. 506, 509 (1970). We note also that the defendant's general objection to Taranto's statement that Canty went outside "in a hurry," even if that testimony could be shown to be prejudicial, should not have been sustained if the testimony was admissible for any purpose at trial. *Commonwealth* v. *Connolly*, 308 Mass. 481, 493 (1941).

However, even were we to ignore the defendant's failure to comply with the appropriate procedural rules, we would be unable to conclude that there was any error. Taranto's testimony cannot fairly be construed as evidence of a prior criminal act. Moreover, otherwise relevant evidence is not rendered inadmissible simply because it may indicate that the defendant has committed another offense. *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372 (1978). *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976). We are not now faced with a situation in which evidence of a distinct crime, unrelated to that for which the defendant is being tried, has been admitted. Rather, Taranto's testimony was relevant to show that the defendant possessed the means to accomplish the killing, see *Commonwealth* v. *Watkins*, 375 Mass. 472, 491 (1978); *Commonwealth* v. *Caine*, 366 Mass. 366, 371 (1974), to identify the murder weapon and place it in the hands of the defendant, and to prove Canty's knowledge that the defendant had a knife on the night in question. See *Commonwealth* v. *Pickles*, 364 Mass. 395, 400 (1973). If the defendant wanted the judge to provide limiting, or curative, instructions he should have made the proper request. Judges are not required, on their own, to instruct juries as to the purposes for which evidence is offered during trial. See *Commonwealth* v. *Selesnick*, 272 Mass. 354, 357 (1930).

3. *Instructions to the jury.* The defendant's final contention is that the judge failed adequately to instruct the jury as to vicarious liability for the crime of murder committed with extreme atrocity or cruelty. The defendant points out that in proving extreme atrocity or cruelty with respect to the actions of a principal, it is not necessary to show that he had any intent beyond that of malice aforethought, see *Commonwealth* v. *Gilbert*, 165 Mass. 45, 59 (1895), or even that he was cognizant of the extraordinary nature of his actions. Rather, the crime must be analyzed objectively, paying attention to the victim's consciousness and degree of suffering, the disproportion between the means needed to cause the death and those actually employed, and the extent of the physical injury or indignities inflicted. *Commonwealth* v. *Cadwell*, 374 Mass. 308, 318 (1978). *Commonwealth* v. *Clifford*, 374 Mass. 293, 307 (1978). The defendant suggests that the "necessary" mental state, i.e., one of savagery, unfeelingness, and brutality of purpose, can be inferred as to the principal from the manner in which the death has been occasioned. See *Commonwealth* v. *Devlin*, 126 Mass. 253, 255 (1879); but see note 10 *infra*. However, no like inference should be indulged in with respect to a joint venturer. Because the jury did not specify whether Monsen was guilty of murder in the first degree as a principal or as an accomplice,[8] or on the basis of premeditation, or extreme

---

[8] The Commonwealth has argued that "[t]o conclude that Monsen was not the principal would require 'indulg[ing] in an impermissible distortion' of the evidence," citing *Commonwealth* v. *Ambers*, 369 Mass. 835, 840 n.3 (1976). It is true that there exists overwhelming evidence that the defendant committed the murder by his own hand. However, we cannot be sure that the jury found the defendant guilty of murder on that basis. Defense counsel sought to persuade the jury that it was McHugh, and not Monsen, who actually stabbed Johnson. Moreover, although it is fairly clear from the record that the Commonwealth's purpose in invoking the joint venture theory was to convict Canty as an accomplice and Monsen as the principal, the judge's instructions permitted the jury to find Monsen guilty as an accomplice as well. In such circumstances, where there are two possible theories on which the jury might convict, and the verdict does not specify

atrocity or cruelty,[9] he now argues that he might have been convicted of the capital offense, without the jury's having found that he possessed the requisite state of mind.

We disagree with the defendant's interpretation of the applicable law. An accomplice who possesses the necessary malice aforethought to justify a conviction of murder in the second degree may legitimately be convicted of murder in the first degree if his partner accomplishes the crime in an extremely atrocious or cruel manner. To import a mens rea requirement into the words "extreme atrocity or cruelty" would be to blur the distinction between that form of murder in the first degree and the premeditated variety. Rather, we think that the Legislature intended to exact the greater punishment of the principal solely on the basis of the shocking, unnecessary, and often painful manner in which the death has been caused. Although the inference that the actor possesses a particularly brutal state of mind might be warranted by the objective circumstances of the killing, no such inference is necessary in order to convict.[10] Considering the

which one was used, it is the duty of this court under G. L. c. 278, § 33E, to review the sufficiency of the charge, regardless of our view of the evidence. See *Commonwealth* v. *Rego*, 360 Mass. 385 (1971).

[9] After reading the murder statute, G. L. c. 265, § 1, to the jury, the judge instructed them that they could return a verdict of guilty of murder in the first degree, if they found either premeditation or extreme atrocity or cruelty. Although both defendants at trial were charged with armed assault within a dwelling, which is a crime punishable by life imprisonment, G. L. c. 265, § 18A, and, as such, could provide the basis for a first degree felony-murder conviction, G. L. c. 265, § 1, the judge specifically withdrew from the jury the possibility of basing their verdict on that theory. In light of the evidence, he might well have permitted the jury to consider the theory.

[10] The defendant is correct in pointing out that in *Commonwealth* v. *Devlin*, 126 Mass. 253, 255 (1879), the court referred to a "savage, unfeeling, and long continued brutality of purpose." However, our opinion in that case does not state such a purpose to be a prerequisite to a finding of extreme atrocity or cruelty. Rather, it was the fact that death was caused by "stamping and jumping upon the person of a

legislative intent with respect to the principal, it would be inconsistent to require a showing of intent beyond that of malice aforethought in order to convict an accomplice of a murder committed with extreme atrocity or cruelty. Cf. *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973). Once malice and a joint venture are shown, we need look only to objective evidence of extreme atrocity or cruelty to support a conviction of both the principal and the accomplice.

*Judgments affirmed.*

---

prostrate woman, and by blows and kicks inflicted with great violence, and repeated during the afternoon and evening, from which, after prolonged agony, she finally died" that permitted characterization of the murder as extremely atrocious or cruel.