COMMONWEALTH *vs.* JEFFREY A. SINNOTT.
(and a companion case[1]).

Worcester.  January 5, 1987. — May 13, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Homicide. Malice. Intoxication. Practice, Criminal,* Severance, Instructions to jury, News report, Fair trial, Interrogation of jurors. *Constitutional Law,* Confrontation of witnesses. *Jury and Jurors. Error,* Harmless.

At the joint trial of two defendants charged with murder on a joint venture theory, during which neither testified, any abridgement of the defendants' Sixth Amendment right to confront witnesses, caused by introduction in evidence of the defendants' respective statements to the police, each implicating the other, was harmless beyond a reasonable doubt where the statements were merely cumulative of other evidence sufficient for the jury to infer guilt. [869-874]

No substantial likelihood of miscarriage of justice or lack of a fair trial was shown in the judge's denial of the defendants' motions for severance based on an assertion of mutually antagonistic defenses, where, at the defendants' joint trial for murder, the jury were warranted in crediting eyewitness testimony strongly implicating both defendants. [874-875]

At a murder trial in which felony-murder was not an issue, the Commonwealth was not relieved of its burden to prove malice by an instruction to the jury which characterized that burden, correctly, by reference to a felony, assault and battery with a dangerous weapon, whose elements, if proved, would permit an inference of malice. [875-877]

At a first degree murder trial the Commonwealth was not relieved of its burden to prove malice by jury instructions which, in the context of distinguishing between manslaughter and second degree murder, referred to death resulting from commission of a felony, where, as a whole, the instructions on malice were proper. [877-878]

The judge at a first degree murder trial adequately instructed the jury on inferring malice from the intentional use of a dangerous weapon. [878]

---

[1] Commonwealth *vs.* Gary E. Mosso. Daniel Blanchard was tried at the same time, but only as an accessory after the fact. He was convicted but has not appealed.

No proof of a defendant's "conscious awareness" that his acts toward the victim were cruel or atrocious is required for a conviction of murder in the first degree based on extreme atrocity or cruelty. [879-880]

No error appeared in the judge's instructions to the jury at a murder trial on the issue of mental impairment due to intoxication as relevant to pertinent elements of aggravation. [880-881]

At the joint murder trial of two defendants, where ample evidence permitted an inference of the mental state required for conviction of one of them on a theory of joint venture, and the judge's instructions on the issue were adequate, there was no miscarriage of justice in the judge's failure to instruct the jury, on his own initiative, as to the effect of intoxication on shared intent. [881-882]

The judge at a criminal trial was entitled to rely on the jurors' unequivocal responses to questions at a voir dire in determining that the jurors remained impartial despite the possibility that they had been exposed to certain reports by the news media. [882-883]

At a murder trial, it was properly within the trial judge's discretion to determine that jurors' exposure to news media reports of possible jury tampering was not so prejudicial as to require a mistrial. [883-884]

INDICTMENTS found and returned in the Superior Court Department on March 8, 1984.

The case was tried before *Herbert F. Travers, Jr.,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for Gary E. Mosso.

*Francis R. Fecteau* for Jeffrey A. Sinnott.

*Harry D. Quick, III,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendants, Jeffrey Sinnott and Gary Mosso, were indicted on March 8, 1984, for the murder of Anthony Tamburro. Their pretrial motions for severance were denied. Their motions for mistrial, based on allegations of juror misconduct, were also denied. On June 26, 1984, the jury found both men guilty of murder in the first degree, on the basis that Tamburro's death was inflicted with "extreme atrocity or cruelty."[2]

---

[2] See G. L. c. 265, § 1 (1984 ed.). The verdict slips gave the jury the option to find, in addition or alternatively, that the defendants had acted with deliberately premeditated malice aforethought.

The prosecutor's case against the defendants was drawn largely from the testimony of four eyewitnesses, no one of whom claimed knowledge of the circumstances surrounding the assault on Tamburro from start to finish. We summarize the testimony of each in turn.

*James Peloquin.* A "very good" friend of the victim, Peloquin gave the most inclusive account. On December 8, 1983, about 9 P.M., Tamburro joined Peloquin and other mutual friends at the Kastle's Keep, a bar in Oxford.

At 1:30 A.M. on December 9, Tamburro and Peloquin talked with the lead singer of the band in the bar about listening to a "demonstration tape" recorded by another band, with whose members they were friendly. Tamburro and Peloquin then went to the victim's automobile to get the tape. They were approached in the parking lot by the defendants, Sinnott and Mosso, and by Daniel Blanchard. Blanchard asked to buy cocaine from Tamburro. Mosso, Blanchard, and Tamburro then entered the latter's automobile.[3] All three emerged several minutes later. Peloquin retrieved the tape from the automobile, then led the way back into Kastle's Keep. Peloquin noticed that Tamburro was no longer with him. He returned to the parking lot.

Peloquin found Tamburro arguing with the defendants and Blanchard. Mosso was complaining about the quality of the "stuff" he had bought, demanding a "taste" from Tamburro's personal supply. Tamburro protested that there was no difference, but Mosso pressed the point. Tamburro put a "taste" from his personal vial on Mosso's outstretched hand, but Tamburro did not offer to let Mosso inhale directly from the vial. An argument ensued, and Mosso then hit Tamburro on the left side of the face. Tamburro swung back. The two began wrestling, with the smaller Tamburro "back stepping" until both fell to the ground with Mosso on top. Mosso pinned Tamburro's left arm and head with his knees, then drove his elbow into the victim's eyes five or six times, "really hard. . . . Like a ramrod."

[3] While Mosso and Blanchard were thus engaged, Peloquin and Sinnott conversed. Peloquin testified that Sinnott was "very drunk."

While Tamburro struggled to retaliate and to wriggle free from Mosso, Peloquin rushed to intervene; but Sinnott knocked him to the ground with a blow to the head. As Peloquin fell, Mosso was getting up. When Tamburro tried to follow, Sinnott kicked him "right square" in the face, knocking him back to the ground. Mosso then kicked the victim repeatedly in the abdomen and legs, while Sinnott kicked him repeatedly about the upper body and face. Peloquin got the victim in a "bearhug" and tried to drag him several feet while yelling at him to get up, but Tamburro did not respond. Mosso and Sinnott now turned to pummeling Peloquin. Sinnott's kick to Peloquin's ribs forced him to drop the victim. In pain, Peloquin returned to the bar for help.

Entering the bar, he looked back and saw Sinnott kick Tamburro in the face. When Peloquin returned to the parking lot with friends and several of the club's bouncers, he saw Sinnott and Mosso in Blanchard's automobile, which "peel[ed] out" with Blanchard at the wheel. Tamburro's face was puffy and bleeding, his mouth "all cut up," and Peloquin could not rouse him. Police arrived, and the victim was taken to a hospital.[4] On cross-examination, Peloquin acknowledged his awareness at the time that Tamburro had sold cocaine to Mosso and Blanchard for $50.

*Stephen M. Amaral.* Like Gary Ducharme, his companion at the Kastle's Keep on the night in question, Amaral did not know any of the participants in the drug deal or the fight. When he left the club about 1:45 A.M., he was, by his own admission, very "drunk."[5] He was in the parking lot and saw, from a distance of forty feet, a group of five or six people. His testimony substantially corroborated that of Peloquin, although there were some variations in his description of the fight.

---

[4] An Oxford police officer testified that, upon his arrival sometime after 1:59 A.M., the bloodied victim was still breathing, albeit with difficulty. After he stopped breathing, "CPR" was administered until an ambulance arrived. Tamburro was taken to Saint Vincent Hospital in Worcester, where he was pronounced dead at 2:52 A.M.

[5] Amaral conceded that his intoxication affected both his ability to observe and his ability to recall what occurred.

Amaral testified that he saw Mosso punch downward with his fist, attacking the victim's groin with three blows. He also testified that Mosso kicked the victim twice in the head, then kicked him in the head twice more while Sinnott did the same. The victim's head was observed to bounce. He was kicked "as if you were going to kick a football on a kickoff."

Amaral then saw the victim get up, try to run, then fall on his back. Sinnott delivered a final kick "half-heartedly" to the head; Mosso lifted the victim's hand and held it for a moment by the wrist. When a group of people came running toward them from the bar, they entered an automobile and drove away "[f]ast." The whole incident, as Amaral observed it, lasted two minutes.

*Gary J. Ducharme.* Before leaving the Kastle's Keep with Amaral at 1:50 A.M., Ducharme had consumed two or three beers. He testified that the alcohol did not affect him. While trying to fix the radio in his truck, he looked up and saw a large person fighting and wrestling with a smaller person. Ducharme saw Mosso punch the smaller man three times in the groin. When the victim tried to rise, Mosso got up and kicked him in the face several times. After the victim fell back, Mosso kicked him again. Sinnott then joined the fray, kicking the victim in the face several times. As he did so, Mosso delivered several more kicks. Ducharme estimated that the fight lasted three or four minutes.

*Douglas Richard Cassidy.* Cassidy knew Tamburro as a former schoolmate, but they were not friends. Cassidy had had several beers before reaching the Kastle's Keep at 11 P.M., and he had had three mixed drinks before he left at 1:30 A.M. He conceded that the alcohol he had consumed was sufficient to affect his capacity as a witness.

Passing through the parking lot on his way to his automobile, Cassidy saw Sinnott and Mosso kicking the victim, who remained motionless, lying face up on the ground. He saw Sinnott and Mosso kick the victim repeatedly in the area of his upper body and head, but he did not see any kicks actually hit Tamburro's head. After ten or twenty seconds, Cassidy approached, looked at the victim, then told Sinnott, "You're a loser for

what you've done. You're a loser." Without response, Sinnott and Mosso entered an automobile and "took off." Cassidy confirmed that Sinnott was drunk. Cassidy testified that the victim's face had been beaten and bloodied beyond recognition.

There was also testimony from police officers and forensic experts. Richard P. Hanlon, a State police trooper, testified that, in the days following the assault, Peloquin identified photographs of Mosso and Sinnott as those of Tamburro's assailants. He reported that Mosso, when first approached by him on December 13, had initially denied he was Gary Mosso. He testified further that Mosso, when first interviewed at police headquarters, admitted that he had spoken to Sinnott outside the Kastle's Keep on the night in question but claimed nothing else happened. When he advised Mosso that he had been identified as one of Tamburro's assailants, Mosso denied any involvement, but, when pressed, asked to see his lawyer; and, after consulting with his attorney, Mosso gave a signed statement, admitting to a scuffle with Tamburro after a cocaine deal soured, but denying that he hit Tamburro at all and blaming Sinnott for all the damage resulting from kicks.

Bradley Mullen, also a State police officer, testified that Sinnott, when first approached by police, threw his hands out in resignation and said he had been expecting them. Robert Meier, another State police officer, testified that he took Sinnott's statement at police headquarters, that Sinnott was "cooperative," and that he never changed his story — which was, in essence, that he had helped Mosso in the fight that broke out over cocaine, but only to the extent of kicking Tamburro once in the ribs and keeping "other people from jumping into the fight."

A pair of Mosso's cowboy boots was delivered to police by Mosso's wife and was entered in evidence. Expert testimony established that the boots were stained with human blood. Pre-autopsy photographs of the victim's body were also admitted in evidence.

Dr. Edward B. Sussman, chief of pathology at Worcester City Hospital and a board-certified forensic pathologist, testified concerning the autopsy he performed on Tamburro's

body. It was his opinion that death was caused by no less than twelve separate blunt traumas, including one injury to the abdomen and another to the back of the neck, at least two to the chest and five to the face, and at least one each to the shoulder, back, and testes.[6] The presence of hemorrhaging led Dr. Sussman to conclude that Tamburro had been alive when he suffered these injuries. The most likely causes of death, he testified, were the injuries to Tamburro's head, but the injuries to his neck, chest, abdomen, or testes were such that they "potentially could cause or contribute to the death of the decedent."

The defendants argue that (1) the judge erred by denying their pretrial motions to sever; (2) the jury were erroneously instructed concerning malice aforethought; (3) the judge erred by denying their motions for mistrial; (4) the charge to the jury was inadequate in various ways having to do with the aggravating element of "extreme atrocity or cruelty"; and (5) relief is warranted pursuant to G. L. c. 278, § 33E (1984 ed.). The defendant Sinnott additionally argues that the evidence of his intoxication should have been treated as relevant to the question of his capacity to enter a joint venture. We affirm both convictions.

1. *Denial of motions to sever.* Both Sinnott and Mosso gave statements to police. At the hearing on their motions to sever, the prosecutor conceded that his planned use of each man's statement at a joint trial would give rise to a "Bruton problem." *Bruton* v. *United States,* 391 U.S. 123 (1968), held that "at a joint trial of two or more defendants the admission in evidence of a confession of a codefendant who did not take the stand and which inculpated the other defendants violate(s) the latters' rights under the confrontation clause of the Sixth Amendment

---

[6] Dr. Sussman also testified that the victim's nose was "crepitant," meaning it felt "bubbly." Both cheeks, both lips, and both ears were bruised and otherwise injured. Numerous ribs were fractured. There was hemorrhaging of the abdominal wall, the large intestine, both lungs, the testicles, the spermatic cord, and the inner scalp near the left ear. The spinal cord was bruised. The brain was swollen, and it had shifted position to a point where it compressed that area of the brain which controls respiration and heartbeat.

to the United States Constitution." *Commonwealth* v. *Horton,*
376 Mass. 380, 388 (1978). The prosecutor maintained that
the *Bruton* rule does not apply "where both defendants arguably
make statements implicating . . . themselves." The judge took
note of the Commonwealth's stated intent to prosecute on a
theory that Sinnott and Mosso had acted as joint venturers in
killing Tamburro. He also noted that each defendant had admit-
ted his own "presence and participation in a fight with the
victim." Relying on *Horton, supra,* and *Commonwealth* v.
*Bianco,* 388 Mass. 358 (1983), the judge declined to grant
severance because "as to each defendant, his own statement
is as damaging as the words relating to him that are contained
in the other defendant's statement."

At their joint trial, neither defendant testified, but the hearsay
statements of each were admitted with instructions limiting the
jury's consideration of each statement to the question of its
declarant's guilt. The Commonwealth relies on the plurality
opinion in *Parker* v. *Randolph,* 442 U.S. 62 (1979), for the
contention that potential prejudice from the possibility that the
jury may fail to heed instructions limiting their use of a nontes-
tifying codefendant's statement is sufficiently "minimized" to
obviate *Bruton* concerns wherever a defendant's own statement
is properly before the jury. See *Lee* v. *Illinois,* 476 U.S. 530
(1986).[7]

Five days after Tamburro died, Mosso gave a statement to
police in which, with his counsel present, he alleged more than

---

[7] Critics of the *Parker* plurality have observed that the opinion "comes
close to saying that so long as all the defendants have made some type of
confession which is placed in evidence, *Bruton* is inapplicable without
inquiry into whether the confessions actually interlock and the extent
thereof." *Parker, supra* at 80 (Blackmun, J., concurring in part).

After this case was argued, the Court again considered the interlocking
confession problem in *Cruz* v. *New York,* 107 S. Ct. 1714 (1987). In *Cruz,*
by a five to four majority, the Court rejected the plurality approach in
*Parker* and adopted "the approach espoused by Justice Blackmun." *Id.* at
1718. Thus, we follow the approach of our own cases, see *Commonwealth*
v. *Bongarzone,* 390 Mass. 326, 341-342 (1983), and that taken by the
Court in *Cruz.* In short, while we believe that the motion judge ruled
correctly on the facts before him, we assume a *Bruton* violation and consider
whether the error can be viewed as harmless.

he confessed. He admitted his presence with Sinnott and Blanchard at the time and place of Tamburro's beating; that he had bought cocaine from the victim; that, disappointed at its quality, he had tried to get his money back; that a fight ensued when Tamburro grabbed him and hit him on the forehead; that the two wrestled on the ground; and that, when the victim held his (Mosso's) ankles to prevent his rising, he directed a kick at the victim's hands. Mosso admitted wearing "work boots," but he denied that he "got" the victim "with anything (punches, kicks or elbows)." By contrast, he alleged that, after he freed himself from Tamburro's grasp, Sinnott leapt from Blanchard's automobile and kicked the victim repeatedly in the face and shoulder; Sinnott ignored Mosso's pleas to "[f]orget it, cut it out," and to leave; after Mosso had retreated to Blanchard's automobile, Sinnott continued kicking the victim's head and chest for three minutes; and, unbeknownst to Mosso at the time, Sinnott wore steel toed boots.

On the same day, Sinnott told police that he was present, too; that, emerging from Blanchard's automobile, he saw Mosso and Tamburro "fighting"; that he (Sinnott) "ran over and . . . gave [the victim] a side kick in the ribs," after which the latter went down, then arose and continued fighting with Mosso; that he (Sinnott) "kept other people from jumping into the fight"; and that, at the time, he guessed "the kid was getting beat bad." However, though he admitted that he had worn "black combat boots," he implicitly attributed the victim's injuries to the alleged facts that Mosso "kept kicking the kid after he was down" and that Mosso "went nuts."

The Commonwealth's theory of culpability of each defendant was that of a joint venture to commit murder in the first degree by either deliberately premeditated malice aforethought or extreme atrocity or cruelty. The jury found the latter only. Concerning proof of a joint venture, "[t]he test is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit [the] crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth v. Bianco, supra* at 366. Both of these defendants clearly admitted the first element ("presence").

A *Bruton* error does not require reversal if the Common-
wealth establishes that violation of the defendants' Sixth
Amendment rights was harmless beyond a reasonable doubt.
*Commonwealth* v. *Bongarzone,* 390 Mass. 326, 342 (1983).
We recognize, however, that, "if the concept of harmless error
is loosely applied, it can serve too readily as a bridge for a
procession of mistakes and injustices." *Commonwealth* v. *Ma-
rini,* 375 Mass. 510, 521 (1978). Therefore, the appropriate
test is stringent, requiring reversal unless any "spillover" result-
ing from imperfect interlock "was without effect on the jury
and did not contribute to the verdict." *Id.* at 520.[8]

The defendants argue that this standard is not met because
the spillover as to malice may have been accepted by the jury

---

[8] "[W]e are mindful of the diverse tests that have been suggested to
implement this standard of review. . . . As we observed in *Commonwealth*
v. *Marini, supra,* the Supreme Court has varied its approach regarding this
issue." *Commonwealth* v. *Hanger,* 377 Mass. 503, 510-511 (1979). See
also *Commonwealth* v. *Graves,* 363 Mass. 863, 865-866 (1973). The Su-
preme Court's most recent pronouncement asserts that "[w]hether . . . an
error is harmless in a particular case depends upon a host of factors, . . .
[including] the importance of the [erroneously admitted evidence] in the
prosecution's case, whether [it] was cumulative, the presence or absence
of evidence corroborating or contradicting [it] on material points, the extent
of cross-examination otherwise permitted, and, of course, the overall
strength of the prosecution's case." *Delaware* v. *Van Arsdall,* 475 U.S.
673, 684 (1986).

The last of these *Van Arsdall* factors is indistinguishable from a test
advanced in *Milton* v. *Wainwright,* 407 U.S. 371 (1972), pursuant to which
the Commonwealth's burden would be carried "by pointing to 'overwhelm-
ing evidence' (at 373) of guilt, distinct from the tainted evidence." *Marini,*
*supra* at 520. The Commonwealth argues that the *Milton* test is applicable
by itself, implying in effect that this last of the *Van Arsdall* factors is of
independent significance.

While *Milton* was not the only Federal decision to comport with the
Commonwealth's view, see, e.g., *Brown* v. *United States,* 411 U.S. 223,
231 (1973); *Schneble* v. *Florida,* 405 U.S. 427, 431 (1972); *Harrington*
v. *California,* 395 U.S. 250 (1969), our own decisions have treated the
*Milton* test as dispositive only where the inculpatory evidence properly
considered by the jury is as "overwhelming" as the "three full confessions"
which had been admissible against the defendant in *Milton. Marini, supra*
at 521 n.12. It has been our practice, foreshadowing *Van Arsdall* in this
respect, to find that constitutional error was, or was not, harmless primarily
by reference to the question whether erroneously admitted evidence was
"merely cumulative" of evidence properly before the jury.

"as corroborating elements of the testimony of witnesses to which they might have otherwise granted less credence." The Commonwealth replies that such effect was merely cumulative of other evidence properly considered by the jury. These positions are not irreconcilable: If the spillover here is corroborative of other evidence which, without such corroboration, permits reasonable doubt concerning a necessary element of proof, such spillover is not merely cumulative because it would necessarily have contributed to the verdict, and reversal would be required; conversely, if the spillover corroborates other testimony on crucial points that is not reasonably in need of corroboration, any error is harmless.

Applying this test, we note that four eyewitnesses testified that they saw *both* Sinnott and Mosso inflicting repeated blows and kicks on Tamburro's head, shoulders, or groin. These were intentional acts from which the jury might properly infer the shared intent necessary to convict each of participation in a joint venture to commit murder with extreme atrocity or cruelty. It is true that the four accounts presented some inconsistencies. It is possible also that the reliability of each witness was impeached to varying degrees by the amounts of alcohol consumed by each witness on the night in question. Nonetheless, there was no disagreement on the crucial point — that both defendants were seen pummeling the victim repeatedly, with savage, senseless brutality. Moreover, the actions reported — two men beating another for a considerable length of time — were of a character so unsubtle as to be unmistakable. Even the accounts of persons allegedly under the influence of alcohol were not reasonably in need of corroboration by any spillover attendant to the *Bruton* error.

As will be discussed at length in the succeeding section, the jury were not instructed erroneously on the element of malice aforethought as it must be found separately to support a verdict of murder. That ruling, taken in tandem with our ruling here that any spillover resulting from *Bruton* error as to shared intent was merely cumulative of evidence properly before the jury, leaves us convinced that the denial, if any, of the defend-

ants' rights under the confrontation clause was harmless beyond a reasonable doubt.[9]

The defendant Mosso claims that denial of severance was improper, too, because his and Sinnott's defenses were mutually antagonistic.[10] "In this Commonwealth severance is usually a matter within the sound discretion of the trial judge." *Commonwealth* v. *Moran,* 387 Mass. 644, 658 (1982). Assuming, though not necessarily deciding, that these defendants' defenses were inconsistent, even to the point of being mutually exclusive, we hold that there was no abuse of discretion because any prejudice resulting from the joint trial here was not "so compelling that it prevent[ed] a defendant from obtaining a fair trial." *Id.*

In *Moran,* we held, implicitly at least, that where defenses of defendants, tried jointly, were shown to be "mutually antagonistic and irreconcilable[,] [t]he prejudice to each defendant was compelling," and severance was required. *Id.* at 659. In *Moran,* the assault was witnessed by no one but the defendants; and the prosecution's best evidence tended to prove "that

---

[9] In arguing that the constitutional error was not harmless here, the defendants do not rely solely on their Sixth Amendment rights as articulated and limited by the Federal progeny of *Bruton,* e.g., *Brown, supra; Milton, supra; Harrington, supra.* They also invoke art. 12 of this Commonwealth's Declaration of Rights, which assures each a right "to meet the witnesses against him face to face." However, if they mean to imply that this Commonwealth's standard for the harmlessness of *Bruton*-type error pursuant to art. 12 is more stringent than the test applied here, they neither develop that argument nor cite authority for the proposition. Thus, we deem the point waived, Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975), and we do not decide the question.

[10] Mosso concedes that the defendants' pretrial motions for severance were argued on *Bruton* grounds rather than the basis claimed here. Therefore, we are not required to address these arguments for the first time on appeal. *Caswell* v. *Licensing Comm'n for Brockton,* 387 Mass. 864, 866 n.2 (1983); *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admin. & Fin.,* 369 Mass. 562, 565 (1976). We do not reach Mosso's argument in the alternative that his trial attorney's failure to seek severance on the ground of antagonistic defenses denied him the effective assistance of counsel to which he is constitutionally entitled. We consider this claim, that antagonistic defenses required severance, only to determine whether a substantial likelihood of a miscarriage of justice is shown. G. L. c. 278, § 33E.

at least one defendant, but not necessarily both of them, robbed and killed [the victim]." *Id.* By contrast, the prosecution here produced four eyewitnesses, each of whom persisted under vigorous cross-examination in testifying that *both* defendants took active parts in battering Tamburro.

The jury in this case were fully warranted in choosing to believe neither defendant and to credit the eyewitnesses instead. Where, as here, the jury enjoyed a highly probative option to rely on neither defendant's account, we cannot say that there was a substantial likelihood of a miscarriage of justice or that a joint trial denied the defendants a fair trial.[11]

2. *Instructions.* a. *Malice.* The defendants challenge the charge concerning malice. They concede, however, that the errors claimed on appeal were not raised at trial. Therefore, "our review is limited to the standard of G. L. c. 278, § 33E, the question being whether the charge as given created a substantial [likelihood] of a miscarriage of justice." *Commonwealth* v. *Porter,* 384 Mass. 647, 656 (1981), citing *Commonwealth* v. *Richmond,* 379 Mass. 557, 562 (1980). No such likelihood appears.

The defendants claim that the trial judge violated their Federal and State constitutional rights to due process by instructing the jury in two different respects, each having the effect of relieving the Commonwealth of its burden to prove malice

---

[11] The State court opinions principally relied upon in *Moran* are not contrary to our view that prejudice can be obviated by eyewitness testimony which strongly implicates both defendants. See *People* v. *Hurst,* 396 Mich. 1, 5 (1976) (no eyewitness to manslaughter of child, so jury had to choose solely between the mutually accusatory accounts of the codefendant parents); *State* v. *Birbiglia,* 149 La. 4, 30 (1921)(similar in that no eyewitness to murder testified at trial); *Murray* v. *State,* 528 P.2d 739, 740 (Okla. Crim. 1974) (facts not recited); *People* v. *Meisenhelter,* 381 Ill. 378, 390 (1942) (prejudice not shown where defenses were not antagonistic). Nor is our position irreconcilable with *People* v. *Espinosa,* 142 Mich. App. 99 (1985), relied upon by the defendant Mosso. Four eyewitnesses also testified in that case, but their accounts varied widely concerning a point the court thought important; and only one witness claimed to have seen the fatal shots fired. Thus, the *Espinosa* jury, as a practical matter, did not benefit in any substantial or clearly probative way from the "third option" presented here by multiple eyewitness accounts in essential agreement on the crucial facts in question.

aforethought beyond a reasonable doubt. See generally *Commonwealth* v. *Zezima,* 387 Mass. 748, 751 (1982); *Mullaney* v. *Wilbur,* 421 U.S. 684, 691-704 (1975); *In re Winship,* 397 U.S. 358, 364 (1970). They also claim, as to one of the challenged instructions, that it also created a constitutionally impermissible presumption. See generally *Sandstrom* v. *Montana,* 442 U.S. 510, 515 (1979); *Commonwealth* v. *Burkett,* 396 Mass. 509, 513 (1986).

The instruction is viewed by the defendants as charging the jury that, if they found either man guilty of assault and battery with a dangerous weapon, they could (without more) find him guilty of murder in the second degree "on a felony murder theory."[12] Error is alleged to result because the instruction permitted the jury to base their verdicts on the very "acts of personal violence which constitute a necessary part of the homicide itself." *Commonwealth* v. *Quigley,* 391 Mass. 461, 466 (1984). In *Quigley* we held that "aggravated battery toward the deceased will not do [as the conduct which constitutes the felony] for felony murder." *Id.,* quoting W.R. LaFave & A.W. Scott, Jr., Criminal Law § 71, at 559 (1972). But felony murder

---

[12] The portion of the charge challenged by the defendants reads as follows:

"Malice aforethought can also be implied where death results from the commission of certain felonies.

"As I already told you, assault and battery by means of a dangerous weapon is a felony. If you determine that Sinnott or Mosso, or both, committed that offense, assault and battery by means of a dangerous weapon, and you find that the Commonwealth has also established beyond a reasonable doubt that death resulted from the commission of the crime, that the murder was the natural and probable consequence of the commission of the crime, and if you find that the Commonwealth has established beyond a reasonable doubt that that crime, assault and battery by means of a dangerous weapon, is a crime that involved inherent danger to human life, then the fact of the commission of that crime, with death resulting, allows you to find the presence of malice aforethought from those facts. So that under those circumstances, you would have at least a murder in the second-degree.

". . . If you have a death resulting under the circumstances I described by one who has committed a felony, an assault and battery by means of a dangerous weapon, then you have a murder in the second-degree."

was not at issue in this case; it was neither argued to the jury as a basis for finding guilt of murder in the first degree, see G. L. c. 265, § 1 (1984 ed.), nor offered as an option to the jury by the judge in his instructions or in the verdict slips.

The danger addressed in *Quigley* — that jurors would suppose themselves empowered to infer an aggravating level of murderous intent solely from commission of a lesser included offense — is not presented here, where the judge merely used "assault and battery by means of a dangerous weapon" as a term descriptive of acts which, if found to have been intentionally performed, would permit the jury to infer malice. Because "[a]n intention to inflict injury on the victim which is not justified on any lawful ground or palliated by the existence of any mitigating circumstances is malicious within the meaning of the law," *Commonwealth* v. *McGuirk*, 376 Mass. 338, 345 (1978), "[t]hese instructions correctly permitted the jurors to infer malice from evidence that the defendant[s] beat and kicked the victim . . . and left him to die." *Quigley, supra* at 466-467. The instruction did not lighten the Commonwealth's burden in proving malice; it merely characterized that burden, correctly, by reference to a felony whose elements, if proved, would permit an inference of malice. There was no error.

As to the allegation that these same words created an impermissible presumption, the defendants argue that the judge erred by telling the jury that commission of an aggravated battery is to be "equated with" malice aforethought. We do not perceive that any reasonable juror could have heard the instruction as mandating any such equation. We look, as we must, at the impression which the charge makes as a whole. *Commonwealth* v. *Benders*, 361 Mass. 704, 707 (1972).

Admittedly, the judge did say, "If you have a death resulting [from commission of an assault and battery with a dangerous weapon], then you have a murder in the second-degree"; but he did so only in a context where it was clear that he sought only to distinguish the crime of murder, in broad strokes, from the crime of manslaughter. He did not speak the challenged words when instructing on malice. The judge emphasized that malice could be inferred properly only if the jury

chose to find "that the Commonwealth has established beyond a reasonable doubt that [aggravated assault] is a crime that involved inherent danger to human life." Compare *Sandstrom, supra* at 515 (jurors "were not told that they had a choice"). Any inference discussed by the judge here was clearly permissive. Even the defendants concede the propriety of permitting jurors to infer malice from findings of "assaultive actions." There was no error.

The defendants' next claim that they were denied due process in that the Commonwealth was relieved of its burden to prove malice because, in effect, the jury received no adequate definition of that element. Their argument concedes that the jury were correctly charged up to the point at which they were told that malice might be inferred from the defendants' intentional use of a deadly weapon; but they argue that malice is not defined properly in these circumstances unless the jury are also told that they may infer malice only from a finding that a defendant intended, in the words of *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980), "to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow."

But judges are not required to deliver their instructions in any particular form of words, so long as all necessary instructions are given in adequate words. *Commonwealth* v. *Martorano*, 355 Mass. 790 (1969). The judge instructed the jury at length on the definition of "dangerous weapons," leaving a clear impression that "an instrument such as a foot covering" could be a dangerous weapon only if, "because of the manner in which it is used, . . . . [it] endangers the life or inflicts great bodily harm, or is calculated as likely to produce death or serious bodily injury." The judge also emphasized that malice might be inferred from using such a weapon to batter a victim only if the jury found beyond a reasonable doubt that this crime, as committed here, "involved inherent danger to human life." Charged as they were, the jury were not likely to suppose that they could find malice without finding the sort of intent described by the words of *Huot*. The judge's charge was not deficient.

b. *Extreme atrocity or cruelty*. The jury were instructed, consistent with our decision in *Commonwealth* v. *Monsen*, 377 Mass. 245 (1979), that an accomplice may be guilty of murder in the first degree on a theory of joint venture if his partner accomplishes the crime in an extremely atrocious and cruel manner, so long as the accomplice is found to have shared that mental state, malice aforethought, which is elemental to the crime of murder in the second degree. From slightly differing standpoints, each defendant challenges the adequacy of this instruction. Even though neither defendant raised these challenges at trial, we review these claims to determine whether there was a substantial likelihood of a miscarriage of justice.

*Mosso*. This defendant argues that the instructions, though consonant with existing law, were outmoded because they are contrary to recent decisional trends suggesting, to the defendant at least, that convictions such as his are upheld only if based on findings that each defendant either had, or shared, a "conscious awareness" of the cruel or atrocious nature of the acts visited on the victim. The short answer to Mosso's argument is that no such trend exists. Our decisions since *Monsen* have not required, as an element of proof for a conviction of murder in the first degree based on findings of extreme atrocity or cruelty, any mental state or "conscious awareness" that the acts committed were extremely atrocious or cruel. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (malice is sufficient).

We have modified the import of *Monsen*, to the extent of permitting juries to consider, in addition to the "objective" factors historically thought pertinent, see *Monsen, supra* at 253-254, certain "subjective" factors, see *Cunneen, supra* at 229 (evidence of defendant's mental retardation may be considered). See also *Commonwealth* v. *Perry*, 385 Mass. 639, 649 (1982) (same as to defendant's intoxication); *Commonwealth* v. *Gould*, 380 Mass. 672, 683-686 (1980) (same as to defendant's prolonged mental illness). But we have expressly disavowed any intent to go further, as Mosso would have us do, by "transform[ing] an evidentiary factor which the jury can consider into an entirely new element of the crime of murder

committed with extreme atrocity and cruelty." *Cunneen, supra* at 228.[13]

*Sinnott.* Two eyewitnesses described Sinnott as "falling down drunk" or glassy-eyed and in a drunken stupor. He argues first that the judge erred when charging that mental impairment due to intoxication could be relevant to the manner in which murder was committed only if the jury found that his mental capacity was "substantially" reduced by consumption of alcohol.[14] Sinnott suggests, to the contrary, that evidence fairly raising the issue of impairment casts a burden on the Commonwealth to prove that he was not impaired. The judge clearly instructed the jury that impairment due to intoxication could be relevant to the pertinent elements of aggravation. His use of the word "substantially" was in accord with the charge we suggested in *Commonwealth* v. *Gould, supra* at 686 n.16. There was no error.

Sinnott also argues that the judge erred by failing to instruct that the central issue was whether his intoxication impaired his "ability to make a decision in a normal manner," *Gould, supra* at 686, and by instructing so as to shift the jury's focus

---

[13] Mosso argues tangentially that our disinclination to require any mens rea beyond malice is contrary to developments in the law of felony-murder designed to prevent convictions "without proof of a culpable mental state with respect to the killing." *Commonwealth* v. *Moran*, 387 Mass. 644, 651 (1982). See also *Commonwealth* v. *Watson*, 388 Mass. 536, 543-546 (1983) (joint venturer in commission of felony is not liable for felony-murder except upon proof he knew facts rendering the felony inherently dangerous); *Commonwealth* v. *Matchett*, 386 Mass. 492, 504-505 (1982) (felony substituting for malice as element of murder must, like malice, evidence defendant's conscious disregard of risk to human life). But the judge clearly instructed that no joint venture could be found without a finding of malice as to each defendant, and that malice could be inferred only from commission of acts clearly dangerous to human life. Because we hold today that no proof was required that either defendant, acting as the principal, was consciously aware of the atrocious or cruel nature of his acts, there was no error in the judge's failure to instruct that either defendant, acting as accomplice, could be convicted only on proof that he shared any such mental state with the principal.

[14] Sinnott concedes that the judge's charge included the instruction mandated by *Gould, supra* at 686 n.16. We note that the wording in *Gould*, like that of the judge's charge, includes the modifier "substantially."

away from his *mental* capacity to the less relevant question whether, despite his impairment, he was *physically* capable of committing acts amounting to extreme atrocity or cruelty. We observe, however, that the judge charged the jury, if they found mental impairment, to "consider the effect, if any, that the defendant's impaired capacity had on his ability to *comprehend* the consequences of his choices" (emphasis supplied). Even if we were to hold that it is error to direct the jury's inquiry solely to the effect of alcohol or drugs on a defendant's physical capacities, to the consequent exclusion of concern for his capacity to think normally, we would decide that the language last quoted was sufficient to direct the jury's attention to the question of mental capacity. Again, there was no error.

c. *Intoxication*. Last, the defendant Sinnott contends that the judge erred by failing, sua sponte, to instruct that intoxication may be relevant to the question whether he was capable of effectively participating in a joint venture "with the requisite mental state." As previously noted, convictions based on the theory of joint criminal enterprise require findings, inter alia, that the abettor shared with the principal the mental state required for the crime charged. *Commonwealth* v. *Bianco*, 388 Mass. 358, 366 (1983). *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

Even if we assume the validity of Sinnott's claim that proper construction of *Commonwealth* v. *Henson*, 394 Mass. 584 (1985),[15] required consideration of the effect of his intoxication on the question of shared intent, the issue was covered by the charge given and there was ample evidence that, despite his intoxication, Sinnott understood what was going on and participated actively in the offense. We have often held that facts

---

[15] In *Henson, supra* at 592-593, where the defendant was tried for assault with intent to murder, we reasoned that, because the concept of an intent to kill is so akin to that of deliberate premeditation, and because juries are permitted to consider whether intoxication incapacitated a defendant to premeditate, logic compelled us to permit consideration of intoxicants with respect to a defendant's capacity to form a specific intent to kill. See *Commonwealth* v. *White*, 392 Mass. 282, 289 (1984) ("Where the alleged joint criminal venture is to murder, liability is premised on a finding that a defendant had the requisite mental state to murder").

such as these permit an inference of the mental state required for conviction on a theory of joint venture. *Commonwealth* v. *Donovan,* 395 Mass. 20, 26 (1985). *Commonwealth* v. *Burrell,* 389 Mass. 804, 807 (1983). *Commonwealth* v. *Soares, supra.* In these circumstances, there was no miscarriage of justice. Thus, Sinnott is not entitled to relief pursuant to G. L. c. 278, § 33E.

3. *Impartiality of the jury.* The Commonwealth concedes that, midway through the trial, news media reports of jury tampering reached certain jurors; and that a trial delay led some jurors to speculate among themselves about the possibility that plea bargaining was afoot. Both defendants moved for mistrial. After each juror was interviewed by the judge with all counsel present, both motions were denied. Both men now claim that, as a result, they were deprived of their rights to trial by an impartial jury as guaranteed by the Fourteenth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights.

On Friday, June 15, 1984, the trial was recessed for the day to permit investigation by police officers of allegations that a bribe had been sought by, or offered to, a juror. By the next Monday morning, these suspicions had been laid to rest; but concern remained that jurors might have heard one or more radio reports of the defendants' criminal records.[16]

On voir dire, the jury foreman disclosed that he had discussed with another juror the "probab[ility]" that Friday's recess was occasioned by "plea bargaining." In this regard, a third juror revealed his understanding that all the jurors had surmised "that the court might have possibly tried to get a lesser charge . . . to . . . speed up the trial." Still, when each of these jurors was asked whether anything occurring since the start of trial would interfere with his ability to make a fair decision based solely on the evidence presented, each answered unequivocally in the negative.

---

[16] No juror, when interviewed, admitted exposure to such reports or to this information.

Pursuant to the Fourteenth Amendment, "[t]he constitutional standard of fairness requires only that the jurors be impartial and indifferent." *Commonwealth* v. *Jackson,* 376 Mass. 790, 799 (1978), relying on *Murphy* v. *Florida,* 421 U.S. 794, 799 (1975).[17] The judge followed the procedures required in this Commonwealth, see *Jackson, supra* at 800;[18] and he determined to his satisfaction that, on this score, all the jurors remained impartial. "He had a right to rely on their responses to his questions." *Commonwealth* v. *Palmariello,* 392 Mass. 126, 142 (1984), citing *Commonwealth* v. *Grant,* 391 Mass. 645, 653 (1984).

The defendants raise a more problematical issue, however, when they observe that two jurors admitted exposure to media reports of possible jury tampering. The defendants argue, in the alternative, that (1) the dangers of prejudice were so great as to require exception from the general rule of *Jackson* and *Grant, supra,* that a judge upon voir dire may rely on jurors' protestations of continued impartiality, or (2) if the taint here were not prejudicial per se, the Commonwealth nonetheless failed to carry its burden of demonstrating harmlessness. Neither argument is persuasive.

We agree that judges must discount jurors' claims of impartiality where jurors also admit, contrarily, to "those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force." *Irvin* v. *Dowd,* 366 U.S. 717, 722 n.3 (1961), quoting 1 Burr's Trial 416 (1807). But the question here is whether exposure to reports of jury tampering creates such an impression so indelibly that the fact of exposure itself requires a mistrial. Admittedly, where

---

[17] Although the defendant Mosso claims that he was denied rights protected by art. 12 of the Declaration of Rights, he does not argue that the art. 12 standard is, or should be, more stringent than that obtaining under the Fourteenth Amendment. Accordingly, we deem the point waived, see Mass. R. A. P. 16 (a) (4), and we do not decide the question.

[18] The defendant Mosso claims error because the judge ruled on the mistrial motions without requiring argument by the prosecution. The argument is frivolous.

jurors become aware of official investigations of alleged bribery, some form of taint might prove ineradicable. In none of the decisions principally relied on by the defendants has any court declared that such taints are inevitably prejudicial. See *United States* v. *Shapiro*, 669 F.2d 593, 603 (9th Cir. 1982) (expressly declining to adopt a per se rule); *Owen* v. *Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984). We do not think such a rule is needed. The matter is better left to the sound discretion of the trial judge. Thus, we decline to hold that the taint here presented was prejudicial in itself.

As to whether the Commonwealth has met its burden of showing the taint to be harmless, we hold that the judge was within his discretion in concluding that there was no harmful taint. While there was evidence that jurors had speculated aloud about possible reasons for the trial delay, the admitted focus of speculation was plea bargaining, not bribery charges. Both of the allegedly tainted jurors denied having discussed the bribery story with other jurors, and their accounts were borne out by the remaining jurors, all of whom denied that any media reports or other extrinsic matters (except pleas) had been discussed. "The finding of the trial court upon that issue [the force of a prospective juror's opinion] ought not to be set aside by a reviewing court, unless the error is manifest." *Dowd, supra* at 723.[19]

No such error appears. The motions for mistrial were properly denied.

4. *Relief pursuant to G. L. c. 278, § 33E.* Because the defendants were tried and convicted on charges of murder in the first degree, we must review their whole cases broadly to decide whether, for any reason, justice may require either a new trial or a verdict of murder in the second degree or manslaughter. G. L. c. 278, § 33E. "The search under § 33E is a . . . general and an obligatory one for a result that may be

---

[19] The judge was correct to resist pressure from trial counsel to inquire of the jurors further, with greater specificity concerning particular media reports or their content. Had he bowed to pressure, he would have risked spreading, by judicial suggestion, the very taint (exposure to rumors of tampering) he sought properly to contain.

'more consonant with justice.' " *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980), quoting *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977). But "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977). We perceive no reason to modify or set aside the jury's verdict.

*Judgments affirmed.*